## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Fredrica M. Brailsford, | ) | C/A No. 3:13-3101-MBS-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Report and Recommendation |
| Wateree Community Action, Inc.; James L. | ) | |
| Coleman, Jr.; Ernestine Lowery; LaShonna | ) | |
| Meagley; Joseph Davis; and Laurey | ) | |
| Carpenter, in their professional and | ) | |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Fredrica Brailsford ("Brailsford" or "Plaintiff"),[1] filed this action against her former employer, Wateree Community Action, Inc. ("Wateree" or "Defendant"); James L. Coleman, Jr.; Ernestine Lowery; LaShonna Meagley; Joseph Davis; and Laurey Carpenter, in their professional and individual capacities on November 14, 2013.[2] ECF No. 1. The operative Second Amended Complaint includes the following claims against Wateree: (1) sex discrimination in violation of Title VII of the Civil Rights Act; (2) Title VII Retaliation; (3) age discrimination; (4) violation of South Carolina Whistleblower Law; and (5) defamation. Plaintiff also brings a claim of civil conspiracy against the Individual Defendants. 2d Am. Compl., ECF No. 6. Jurisdiction over the federal claims is based on 28 U.S.C. § 1331. Jurisdiction over the state-law claims is based on the court's supplemental jurisdiction, 28 U.S.C. § 1367. This matter

---

[1] Plaintiff was represented by counsel when this action was filed. After filing a response in opposition to the pending Motion for Summary Judgment, Plaintiff's counsel moved to be relieved. *See* ECF No. 50. Upon briefing, the undersigned granted the motion to be relieved, and Plaintiff is now proceeding pro se. *See* ECF No. 63.

[2] The individual Defendants are referred to collectively as "the Individual Defendants," and, individually by surname.

is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on Defendants' Motion for Summary Judgment. ECF No. 33.

Having considered the Motion; Plaintiff's Response, ECF No. 49; Defendants' Reply, ECF No. 53; and applicable law, the undersigned recommends that Defendants' Motion for Summary Judgment be *granted* and this matter be ended.

I.    Plaintiff's Federal and S.C. Whistleblower Act Claims

In response to Defendants' Motion, Plaintiff, through counsel, does not contest entry of summary judgment as to her claims for sex discrimination, age discrimination, retaliation, or violation of South Carolina's Whistleblower Law. *See* Pl.'s Resp. 7 (Title VII sex discrimination), 7-8 (retaliation), 8 (age discrimination), 9 (S.C. Whistleblower Act). Accordingly, it is recommended that summary judgment be *granted* as to Plaintiff's claims of sex discrimination, retaliation, age discrimination, and Violation of South Carolina Whistleblower Act (Causes of Action One through Four). Diversity jurisdiction does not exist. *See* 2d Am. Compl. ¶¶ 1-7 (indicating all parties reside in South Carolina). If this portion of the Report and Recommendation is adopted, all claims within the court's original jurisdiction will be ended.

II.    Supplemental Jurisdiction

The court must then determine whether it should exercise supplemental jurisdiction under 28 U.S.C. § 1367(a). "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if- . . . (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(3). As noted by the Fourth Circuit Court of Appeals, "Once a district court has dismissed the federal claims in an action, it maintains 'wide

discretion' to dismiss the supplemental state law claims over which it properly has supplemental jurisdiction." *Yashenko v. Harrah's N.C. Casino Co., LLC,* 446 F.3d 541, 553 n.4 (4th Cir. 2006) (citing *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 353-54 (1988)). In exercising this discretion, a district court must consider "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan v. Cahill,* 58 F.3d 106, 110 (4th Cir. 1995) (citing *Cohill*, 484 U.S. at 350 n.7). In the event a court declines to exercise supplemental jurisdiction, the "period of limitations" for remaining claims "shall be tolled while the claim is pending [in federal court] and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 42 U.S.C. § 1367(d).

Plaintiff substantively responds to Defendants' summary-judgment arguments regarding her claims of defamation (against Wateree) and civil conspiracy (against the Individual Defendants). *Id.* at 9-17. She then "respectfully requests" that, "[a]ssuming the Court agrees with the arguments set forth by the Defendants in regards to Plaintiff's federal claims," the court decline to exercise its supplemental jurisdiction over the remaining state-law claims of defamation and civil conspiracy and that they be "transferred to South Carolina State Court, Court of Common Pleas, for final resolution." *Id.* at 18. Plaintiff submits that there is an interest in having the state-law claims adjudicated in state court. *Id.* at 19.

In reply, Defendants disagree. Defs.' Reply 4-6. Defendants correctly note that, as this matter was not filed in state court initially, the matter could not be remanded (or "transferred") to state court. They also submit that factors informing the decision regarding whether to exercise supplemental jurisdiction weigh in favor of this matter proceeding in this court. *Id.* Defendants note that Plaintiff chose the federal forum when she filed her employment case. Further,

Defendants submit that the "substantial resources" they have devoted to litigating this case in federal court—including completed documentary discovery, depositions, and multiple subpoenas—would need to be duplicated in state court, at additional costs to the litigants. *Id.* at 4-5. Defendants further submit that "[j]udicial economy would not be served if Plaintiff were to begin anew in state court." *Id.* at 5. Defendants submit that federal courts "routinely decide" defamation and civil conspiracy claims, particularly when the law is not disputed by the parties. Finally, Defendants submit declination of supplemental jurisdiction at this juncture would be especially prejudicial to the Individual Defendants. *Id.* at 6.

The undersigned recommends the court retain jurisdiction over Plaintiff's defamation and civil conspiracy claims. Continuing the case in federal court is both fair and convenient to both parties, as neither side would incur additional expenses or travel difficulties. Additionally, Plaintiff is now proceeding pro se.[3] If the court declined supplemental jurisdiction, Plaintiff would be required to refile in state court, and adjudication in state court would likely take longer than in this court, where proceedings are already underway. As such, issues of fairness and convenience to the parties suggest retaining jurisdiction over these state-law claims.

Issues of federal policy and considerations of comity do not weigh against retaining supplemental jurisdiction over the state claims, which require straightforward application of defined case law. As such, issues of comity do not dictate against retaining jurisdiction. Accordingly, the undersigned now considers Defendants' Motion for Summary Judgment as to Plaintiff's defamation and civil conspiracy claims.

---

[3] The court notes Plaintiff's request that the matter be "transferred" to state court was written by Plaintiff's former counsel. Since becoming pro se, Plaintiff has not communicated with the court in any manner.

III.    Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The*

*Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

IV.     Factual Background

Taken in the light most favorable to Plaintiff as supported in the record, the court considers the following facts:

Plaintiff worked for Wateree from September 1986 until she was terminated effective August 6, 2012. Pl.'s Dep. 30-31.[4] Wateree is a non-profit organization that aims to assist low-income and indigent individuals in Clarendon, Lee, Kershaw, Richland, and Sumter counties to better their living conditions. *Id.* at 33-35. Wateree is governed by a Board of Directors and a management team consisting of an executive director, finance director, head start director, weatherization director, and a community services and energy ("CSE") director. Pl.'s Dep. 35. Prior to her termination, Plaintiff served as the CSE Director, managing the Community Services Block Grant ("CSBG") and the Low Income Home Energy Assistance Program ("LIHEAP") programs. The CSBG and LIHEAP programs were overseen largely by the South Carolina Office of Economic Opportunity ("OEO"). *Id.* at 43-45.Wateree is funded primarily through block grants from federal programs that are allocated through the OEO to community action agencies based on poverty data for each county. *Id.* at 41; Dep. of Wateree Executive Director (and Defendant) Coleman 159, ECF No. 49-4. The OEO monitors the expenditure of funds to

_____

[4] Plaintiff's deposition may be found at ECF No. 49-1. Excerpts of her deposition provided by Defendants are available at ECF Nos. 33-3 and 53-1.

ensure they are spent according to the policies, guidelines, regulations, and grant agreements. Coleman Dep. 159, Pl.'s Dep. 45. The OEO sends a grant agreement at the beginning of each fiscal year and conducts regular audits to ensure compliance by the community action agencies. Coleman Dep. 160. If the OEO determines funds are not being spent pursuant to the regulations and agreements, the OEO could require the money be refunded and, ultimately, defund the agency. *Id.* at 160-61.

Wateree provided Plaintiff with an updated handbook in January 2012 ("Handbook"). ECF No. 33-5 (handbook), *see* Pl.'s Dep. 31. Plaintiff signed a Notice and Disclaimer upon receipt of the Handbook acknowledging that she was an at-will employee and her understanding that the "agency or the employee may terminate the employment relationship at any time with or without cause or notice." ECF No. 33-6. The Handbook included an Equal Employment Opportunity and Harassment policy stating Wateree does not discriminate in any aspect of employment and directing employees to report any violations of policy to their supervisors, any other member of management, human resources, or the Chief Executive Officer ("CEO"). *Id.*

As CSE Plaintiff's job description states that she "assumes full responsibility for directing, supervising, planning and managing [CSBG] and [LIHEAP] projects to benefit the low income [individuals] of Clarendon, Kershaw, Lee, Richland and Sumter Counties." ECF Nos. 33-7, 33-8; Pl.'s Dep. 43. Plaintiff was responsible for coordinating the OEO audits of the CSBG and LIHEAP programs. ECF Nos. 33-7, 33-8; Pl.'s Dep. 45.

On May 3, 1993, Rubye J. Johnson, Wateree's then-Executive Director, wrote a letter to Plaintiff expressing concern regarding Plaintiff's lack of planning and attention to detail. ECF No. 33-9. Johnson noted that over the previous two years, she had observed a lack of "planning and priority setting" by Plaintiff and "again warn[ed]" her that, unless improvements were made,

Wateree could lose grant funds. *Id.* at 1. Johnson particularly counseled Plaintiff that "[i]mprovements [were] needed in time-charted planning, narrative writing and organization skills, grammar, spelling and research and evaluation recordation." *Id.* Johnson also noted Plaintiff was treating her monthly reporting responsibilities with "little importance." *Id.* Johnson instructed Plaintiff that, "[t]o help prevent a reoccurrence of last minute rushing," Johnson was requiring that Plaintiff plan to submit "tasks" to her "far in advance of the required date they are due to a funding agency. In this way, we can avoid errors, stress and interference with my schedule." *Id.* at 2. Plaintiff had discussions with Johnson on at least a quarterly basis to discuss, *inter alia*, Plaintiff's performance. Pl.'s Dep. 60.

On November 2, 2005, as she was concluding her term as Executive Director, Johnson provided Plaintiff with a memorandum titled "Important Words of Wisdom," which set out several issues that persisted with Plaintiff's job performance. ECF No. 33-10. In part, the memorandum provides:

> There is deep concern that I have regarding the quality and efficiency reflected in work going out from your office to one of our major funding agencies, the State O.E.O.
>
> The funding agency should not have to discover errors to point up to us over and over again when we have well-paid professional staff hired to prevent that, to produce efficiency plus (sic) and to teach subordinate[s] how to be efficient and error-conscious.
>
> Case in point are the two documents enclosed. The memorandum to Ms. Lancaster, the State O.E.O. Director, as brief as it is, has two gross grammatical errors. It shows a deficiency in knowledge about subject-verb agreement, which is literally elementary education. This is an area I have pointed out to you to improve on, many times before.
> . . .
>
> Another case attached is where State O.E.O. again is pointing up errors that should have or could have been avoided by us. It is very costly, time consuming and frustrating to anyone who reviews your work and repeatedly detects errors to be corrected. We are dubbed "high risk" by State O.E.O. because we are so error-

> pron[e]. Whether they be miscalculations or omissions, we are a weak and dangerous threat to them and our records reflect that.
>
> You might feel that I sound like a broken record to keep repeating and calling for your improvement, but repeating only for repeating sake is not my intent. The bottom line is that I want to see our agency grow and develop for the sake of the poor people who need it.

*Id.* In closing, Johnson advised Plaintiff that the new executive director is "not likely to take a chance on accepting status quo where that status is waning and decreasing to the agency's quality and production." *Id.*

At the end of 2005, Johnson resigned and Wateree hired Willie Bethune as its executive director. Pl.'s Dep. 36-37. In 2009, Georgia Mance replaced Bethune as executive director. *Id.* at 37-38. On November 30, 2009, Nance sent a memorandum to Plaintiff concerning "Submission of Required Reports." ECF No. 33-11. Mance reprimanded Plaintiff for failing to provide reports to the funding agencies by the due date. *Id.* Ms. Mance noted that "during the past week(s) the fiscal department had to gather data to submit to Santee-Lynches that had not been addressed" and that the documents "were needed . . . to finalize our program's monitoring deficiencies." *Id.* Because of Plaintiff, "[t]he staff in the fiscal department had to put their work on hold in order to address your assignment." *Id.* Wateree lost the Santee-Lynches grant the following year. ECF No. 33-12.

On November 19, 2009, the OEO received a complaint from a vendor about Plaintiff's department. ECF No. 33-13. The OEO conducted an investigation and, based on its findings, placed Wateree on a Corrective Action Plan.[5] Plaintiff prepared a Corrective Action Plan on behalf of the CSBG and LIHEAP programs. Pl.'s Dep. 67-68.

---

[5] A Corrective Action Plan is a document the OEO directs the program director and/or agency to prepare to correct deficiencies identified by the OEO. Pl.'s Dep. 57-58, Coleman Dep. 161-62.

On April 26, 2010, the OEO issued a report regarding its investigation and Wateree's proposed Corrective Action Plan. ECF No. 33-13. Portions of the report commended Wateree for its responsiveness to concerns the complaint had raised. The OEO noted it would continue to monitor complaints of ethical issues in administering the LIHEAP program and that Wateree had specifically responded to these concerns. *Id.* The OEO emphasized that "Wateree has a conflict of interest statement that requires approval from the Executive Director for employees to serve other employees of the agency" and noted that "[a]dditional actions to further prevent conflicts of interest have been implemented and are being enforced." *Id.* The OEO indicated it would continue to monitor Wateree to ensure conflicts of interest do not arise and that the agency follows the additional policies that Plaintiff included in the Corrective Action Plan. *Id.*

Plaintiff was serving as Director of CSE when Wateree began seeking a new executive director. Plaintiff applied for the position twice, was interviewed once, but was not hired.  Pl.'s Dep. 72-73. Wateree selected Defendant Coleman as Executive Director on August 16, 2010. *Id.* at 40. Plaintiff did not know Coleman prior to his selection as Executive Director other than a brief meeting at a banquet. *Id.* at 73, Coleman Dep. 24. On September 15, 2010, Coleman sent an email to Plaintiff asking her to put in writing by the end of that day why Wateree lost the Workforce Investment Act ("WIA") grant funded by Santee-Lynches. ECF No. 33-12 at 2. In a responsive email Plaintiff listed several "issues that contributed to the declining efficiency of the WIA program and loss of the Contract." *Id.* at 3. Among other things, Plaintiff advised Coleman that Santee-Lynches had identified numerous errors during their monitoring visits, including incorrect documentation and inaccurate information provided in reports. *Id.* Plaintiff further explained that Santee-Lynches found Wateree staff working on the CSBG and LIHEAP

---

The Plan must be approved by the OEO, and the OEO will monitor to ensure compliance with the Plan. Coleman Dep. 161-62.

programs was not loyal to the agency. Plaintiff indicated this took place because the "funding source" visited regularly and had "no respect for this agency's internal program structure." *Id.* Plaintiff noted that not all issues she identified were present at the same time. "It was more of reviewing files fixing one problem then staff would be too relaxed in another area." *Id.*

In deposition, Plaintiff acknowledged that she was responsible for the program structure of CSBG and LIHEAP and for ensuring the proper administration of the WIA grant. Pl.'s Dep. 81-82.

In an October 19, 2010 email, Coleman reminded Plaintiff that she had been advised when he first became Executive Director that all reports were to be submitted to him before they were due and before they were sent out and questioned why a LIHEAP report had been submitted without his review. ECF No. 33-14 (noting "I wanted to put this in writing because I am seeing a pattern of things being done without my review and approval."). Coleman repeatedly warned Plaintiff regarding the timeliness of her reports. Pl.'s Mem. 88; *see* ECF No. 33-15 (Oct. 26, 2010 email), ECF No. 33-17 (Nov. 4, 2010 email), ECF No. 33-18 (Jan. 12, 2011 email), ECF No. 33-19 (Jan. 12, 2011 email), ECF No. 33-20 (Jan. 13, 2011 email).[6]

In an October 27, 2010 memorandum, Coleman reprimanded Plaintiff for mismanagement of time, exercising poor judgment, and improper execution of duties as the CSBG/LIHEAP Director. ECF No. 33-16. In the "formal and written reprimand," Coleman again identified Plaintiff's failure to provide information in a timely manner: "I have spoken to you concerning timeliness of submitting reports and other documents to me for review, questions, approval and signature so they are reviewed by myself and submitted by deadlines."

_____

[6] In responding to Defendants' Motion, Plaintiff indicates she "continued to make her best efforts to meet Coleman's expectations by calendaring deadlines well in advance, promising Coleman that all reports would be submitted for his review, and submitting a written plan per his demand for the same." Pl.'s Mem. 2 (citing Pl.'s Dep. 85-88).

*Id.* Coleman also noted a "pattern of mismanagement of your time," the "mismanagement of your subordinate staff," the failure to ensure staff is "compensated in a timely manner," and that she continued to "submit[] documents to our funder without giving me adequate time to review, ask questions, and approve for submission." *Id.* Coleman placed Plaintiff on a 30-day work improvement plan and warned her that any further problems could result in additional discipline up to and including termination. *Id.*

In early December 2010, Coleman discovered Plaintiff had failed to pay an SCE&G invoice for months, resulting in an outstanding invoice for $354,249.12 and a past due balance of $64,373.34. ECF No. 33-21. SCE&G issued Wateree a delinquency notice that warned service to Wateree clients would be disconnected if it did not receive payment by December 15, 2010. *Id.* The notice also warned that failure to pay by the deadline could hinder SCE&G's ability to work with Wateree in the future. *Id.* Coleman reprimanded Plaintiff for failing to have a structure in place to ensure timely payment of invoices: "[a]s the Director of this program, I again state that this is unacceptable and speaks to my concern related to poor oversight and poor leadership in your area." *Id.*

When the OEO audited Wateree's CSBG and LIHEAP programs for the fiscal year ending on December 31, 2010, the OEO again uncovered deficiencies in the CSBG and LIHEAP programs. ECF No. 33-22, Pl.'s Dep. 94. In the CSBG program, the OEO discovered inaccurate reporting of federal expenditures and warned that the "over or under statement of expenditures reported . . . to the OEO could place the Agency in jeopardy of mismanagement of federal funds." *Id.* at 3. The OEO required Wateree to submit a Corrective Action Plan to address, *inter alia*, the inaccurate reporting of federal expenditures. *Id.* In the LIHEAP program, the OEO found that the agency had an over-expenditure of $586,582.05. *Id.* at 5. The OEO again warned

that overexpenditure of funds could result in the mismanagement of federal funds and required a Corrective Action Plan. *Id.* at 5-6.

In a January 4, 2011 email, Coleman directed Plaintiff to provide a report outlining how such a large mistake in budget management could occur and what steps she would take to ensure it would not happen again. ECF No. 33-23. Plaintiff testified that, as project director, she was ultimately responsible for management and oversight of the system that led to the over-expenditure. Pl.'s Dep. 99.

On January 20, 2011, Coleman issued a formal written reprimand to Plaintiff for poor monitoring and oversight of the CSBG/LIHEAP programs, improper execution of duties, and negligence in the performance of work duties as the CSBG/LIHEAP Director. ECF No. 33-24. Specifically, Coleman noted the following: failure to provide the work-improvement report she had been instructed to provide in her October 27, 2010 reprimand; failure to have processes in place to monitor payment of invoices; failure to properly administer the CSBG/LIHEAP programs, resulting in the programs' over-expending the budget by approximately $663,000. *Id.* Coleman reminded Plaintiff that her position as Program Director required a high level of monitoring and oversight, and reinforced that she must remain in compliance with OEO guidelines at all times. *Id.* Coleman placed Plaintiff on a 90-day work improvement plan and directed her to submit a written plan outlining how she would improve her performance. *Id.* Coleman also warned Plaintiff that she would be closely monitored and assessed over the next 90 days to determine her future employment with the agency. *Id.*

On March 3, 2011, the OEO issued initial findings from its mandatory compliance audit of Wateree's CSBG/LIHEAP programs. ECF No. 33-25. The focus of the audit was to determine "if conflicts of interest, fraud, and/or mismanagement of grant funds occurred at Wateree." *Id.* at

3. The OEO's investigation uncovered 18 incidents of conflicts of interest within the CSBG/LIHEAP program. *Id.* at 3-4. The OEO found:

> Based on complaints/allegations from constituents that agency staff serves themselves, other employees and their family members, **OEO determines that many of the allegations are true and valid (refer to OEO's Grant Agreements, Wateree's Personnel Policy Manual and Program Integrity/Fraud Policy for guidelines and consequences).**

*Id.* at 7. (emphasis in original). Plaintiff was the CSBG/LIHEAP Director during the time period covered by the audit. Pl.'s Dep. 112. The OEO concluded Wateree employees in the CSBG/LIHEAP program were not eligible for services that they or their family members received, and required Wateree to submit a Corrective Action Plan by March 18, 2011. ECF No. 33-25 at 7. Plaintiff acknowledged the conflicts of interest raised in the audit were a violation of the OEO grant agreements and the Wateree Personnel Manual. Pl.'s Dep. 114.

As part of the audit and subsequent Corrective Action Plan, OEO directed Wateree to terminate or demote up to eleven employees in the CSBG/LIHEAP program. Coleman Dep. 110, Pl.'s Dep. 117-18. Coleman had instructed Plaintiff to be present for meetings with the employees identified by the OEO, as she was the director of the impacted programs. ECF No. 33-26. Despite Coleman's direction, Plaintiff either did not show up or arrived late for the meetings. *Id.* Plaintiff later admitted to Coleman that she lied to him about her whereabouts when she was late to one meeting. *Id.*; Coleman Dep. 77-78.

On April 12, 2011, Coleman issued Plaintiff a reprimand for her "third and final offense before further disciplinary action." ECF No. 33-26. Coleman reminded Plaintiff that the Program Director position requires a high level of integrity, honesty, professionalism, accountability, responsibility, and knowledge, and that her actions have caused him to have great concern about

her ability to continue to lead the CSBG/LIHEAP program. *Id.* Plaintiff was placed on another 90-day work improvement plan. *Id.*

Plaintiff sent an email to Coleman on April 18, 2011 in response to the April 12, 2011 reprimand in which she noted, *inter alia*, "I believe that I am being and have been humiliated and embarrassed before others in the work place since October 22, 2010, on a constant bas[i]s." *Id.* at 3. She further stated she felt she had been "harassed and intimidated" and not afforded "the same respect or courtesy as any of the other Project Directors." *Id.* Plaintiff copied an attorney on the email and indicated the email was intended as an informal grievance. *Id.* Coleman thanked Plaintiff for her response and noted her reprimands would remain in her file. *Id.*

Approximately two weeks later, Coleman attended a meeting of the South Carolina Community Action Partnership ("SCCAP"), where he learned for the first time while sitting on the dais that Plaintiff was being installed as First Vice President of the organization. ECF No. 33-27. On April 25, 2011, Coleman emailed Plaintiff to express concern over her decision to take on additional responsibilities while CSBG/LIHEAP was under a Corrective Action Plan from the OEO:

> With all that is going on in the CSBG/LIHEAP program, I feel that you should have discussed this with me prior to submitting your name or allowing your name to be submitted as a candidate for office. I would have thought that you would consider these things, especially being that we are under a corrective action plan in your area.

*Id.* at 5. Plaintiff apologized to Coleman for failing to consult with him regarding service on the SCCAP board. *Id.* Coleman directed Plaintiff to resign from the SCCAP Board in light of the challenges facing the CSBG/LIHEAP programs for which she was responsible. *Id.* at 4, Coleman Dep. 94. Plaintiff initially agreed, but informed Coleman a few days later that she had "revisited

[her] decision to resign from the SCCAP Association board per [his] request and [she had] changed [her] mind." ECF No. 33-27 at 1, Coleman Dep. 96.

In an email dated April 28, 2011, Plaintiff provided Coleman with a "2010 Outstanding Balance Report." ECF No. 49-8 at 4. She copied Defendant Davis on the email. *Id.* Coleman responded by asking whether funds were available to pay the balances. Then-Chief Financial Officer ("CFO") Morris was copied on the email. *Id.* at 3-4. Plaintiff responded to all included on the email and advised additional funds in excess of $36,000 would be needed. *Id.* at 3. Coleman responded to Plaintiff and all on the email chain that she had indicated previously that Wateree needed only $13,000 to clear outstanding bills and noted he had already presented that figure to Wateree's Board. *Id.* In response to Coleman only, Plaintiff noted the $13,500 figure was only to handle the SCE&G deficit. *Id.* Coleman responded to Plaintiff, copying Morris and Davis, that "that is worse if we still owe in other areas do (sic) to the poor oversight and monitoring." *Id.* at 2-3. Plaintiff responded to Coleman that a final balance report had been forwarded to him, Davis, and her the previous week, noting they had "come a long way from the 1.3 million deficit." *Id.* at 2. Plaintiff asked whether Coleman had other recommendations "to closeout these applications." *Id.* Coleman responded to Plaintiff, "If the program was provided proper monitoring and over site (sic) the [deficit] would not h[]ave [existed]." *Id.*

The OEO continued to investigate the concerns identified in its March 3, 2011 initial report. Coleman Dep. 112. In the process of meeting with the employees identified in the OEO report, Coleman learned that Plaintiff had been aware of, and had given permission to, employees to complete applications for their immediate family members. *Id.*

On May 3, 2011, Coleman placed Plaintiff on administrative leave with pay pending completion of the investigation by the OEO. ECF No. 33-28 at 1. Coleman noted that Plaintiff's actions, "if

16

proven to be factual, can be classified as poor monitoring and oversight of the CSBG/LIHEAP Program area; improper execution of duties; and negligence in the performance of work duties as the CSBG/LIHEAP Program Director . . . [and that could] be classified as aiding and abetting an employee under your supervision to commit fraud in a federal grant program." *Id.* Although the OEO had not completed its investigation, Wateree allowed Plaintiff to return to work in a limited capacity on June 22, 2011. *See* Pl.'s Dep. 129. As of August 1, 2011, Plaintiff was moved to the position of budget manager, and her salary was reduced by $19,000. *Id.*, *see* Coleman Dep. 113-14, 129. Plaintiff filed a grievance regarding this change. Pl.'s Dep. 137-38. A hearing was held on November 2, 2012 upholding the personnel action. *See id.* at 137-39. Plaintiff appealed that decision and received a portion of her salary back, retroactive from August 2011. *Id.*, ECF No. 49-11.

Plaintiff continued to work in a variety of positions for Wateree, including Director of Budgets and Fund Development and Kershaw County Coordinator. *See* Coleman Dep. 134, 141-42.

The OEO issued its final report on June 11, 2012. ECF No. 33-29 (OEO Report). The report identified significant adverse findings against Wateree, resulting in the agency being placed on Corrective Action Status. *Id.* The OEO further noted that Wateree had mismanaged funds, requiring reimbursements to the OEO. *Id.*

By letter dated August 3, 2012, Coleman informed Plaintiff that her employment with Wateree would be terminated on August 6, 2012, based on the OEO's findings. ECF No. 33-30. Plaintiff was given the option of resigning rather than being terminated. *Id.*

On August 9, 2012, Plaintiff filed a grievance to dispute her termination. ECF No. 33-31. Wateree's Peer Grievance Committee heard Plaintiff's grievance on September 18, 2011, and

advised Plaintiff in an October 2, 2012 letter that her termination had been upheld. ECF No. 33-32.

V.      Plaintiff's Defamation Claim

Plaintiff brings her defamation cause of action against Defendant Wateree only, although the body of the allegations refers to actions of "Defendants." 2d Am. Compl. ¶¶ 54-60. In her pleading, Plaintiff alleges that "[l]eading up to and upon her termination [she] was falsely accused by the Defendants with many allegations, including, but not limited to, being incompetent in the performance of her profession and attempting to conspire against her employers." *Id.* ¶ 55. Further, she pleads that she was terminated following "accusations about the improper performance of her job, an increased knowledge of the allegations against Plaintiff within the peers of Community Action Agencies." *Id.* ¶ 57. In her deposition, Plaintiff indicated her defamation claim is "based on emails and correspondence," and that it was Coleman who defamed her. Pl.'s Dep. 162. She specifically references a letter Coleman sent to other agencies that accused Plaintiff of "having attempted to have [Coleman] removed from his job." *Id.* at 162-63. Plaintiff also identified the correspondence sent to agencies informing them Plaintiff was out on administrative leave. *Id.* at 163. Plaintiff also testified Coleman had "conversations" discussing Plaintiff in a negative manner. *Id.* at 164. More specifically, Plaintiff testified she had heard Coleman tell Defendant Meagley that "something was wrong" with Plaintiff, although they "could not put their finger on it." *Id.*

A defamatory statement is one that "tends to harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with him." *Fleming v. Rose*, 567 S.E.2d 857, 860 (S.C. 2002). The tort of defamation permits "a plaintiff to recover for injury to his or her reputation as the result of the defendant's

communications to others of a false message about the plaintiff." *Erickson v. Jones St. Publishers, L.L.C.*, 629 S.E.2d 653, 664 (S.C. 2006). To establish a claim of defamation, Plaintiff must prove: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or the publication of the statement caused special harm. *Fleming*, 567 S.E.2d at 860. Defamatory statements that an individual broke the law or was unfit for her profession are defamatory *per se*. *See, e.g., Parish v. Allison*, 656 S.E.2d 382, 390 (S.C. Ct. App. 2007). Malice and damages are presumed in the case of defamation *per se*. *See Holtzshieter v. Thompson Newspapers, Inc.*, 506 S.E.2d 497, 501-02 (S.C. 1998) (*Holtzshieter II*). Defamation need not be accomplished in a direct manner. *Eubanks v. Smith,* 354 S.E.2d 898, 901 (S.C. 1987); *Tyler v. Macks Stores of S.C., Inc.,* 272 S.E.2d 633, 634 (S.C. 1980).

In seeking summary judgment, Wateree discusses the three distinct instances of alleged defamation identified by Plaintiff in her deposition, arguing Wateree is entitled to judgment as a matter of law as to each. Defs.' Mem. 29-31. In response, Plaintiff does not contest Wateree's arguments regarding these three incidents. Pl.'s Resp. 10. Rather, Plaintiff submits that "[r]egardless of the Defendant's arguments regarding these three incidents, the record remains ripe with defamatory content." *Id.* at 10 (labeling the instances Wateree discussed in Motion as "cherry-pick[ing] the record to highlight questionable instances of alleged defamation, and ignor[ing] more clear-cut instances of defamation."). *Id.*

Wateree requests summary judgment as to the instances of defamation alleged by Plaintiff in her deposition and discussed by Wateree in its Motion. Defs.' Reply 2. The undersigned agrees. Plaintiff does not contest entry of summary judgment as to the three instances discussed by Wateree in its Motion, *see* Pl.'s Resp. 9-12, Defs.' Mem. 29-31, and has

abandoned such arguments. *See Lee v. Jasper Cnty.*, No. 9:09-1878-SB-BM, 2012 WL 7149678, at *8 (D.S.C. Sept. 6, 2012) (noting undefended claims regarded as abandoned) (citing *Burns v. Air Liquide Am., L.P.*, 515 F. Supp. 2d 748, 759 n.9 (S.D. Tex. 2007)), *report and recommendation adopted*, No. CIV. A. 09-1878, 2013 WL 594890 (D.S.C. Feb. 14, 2013).

Rather than contest summary judgment as to the allegedly defamatory matters identified by Plaintiff in her deposition, Plaintiff submits five bullet-point summaries of the "evidence of defamation" in her response:

- The Defendant Coleman sought to reduce the Plaintiff's salary only months after his arrival despite no actual change in her job duties, which interaction became known throughout the agency;

- When Plaintiff was permitted to return from administrative leave, she was prohibited from re-entering her office and was forced to relocate within the building, and was forced to seek an escort if and when she needed something from her prior office;

- Next, the Defendant Coleman continually reassigned and demoted Plaintiff to other positions in late 2011 through 2012 despite producing no evidence of poor performance to justify such demotions;

- The Defendant Wateree attempted to portray the faults of CSBG/LIHEAP to be solely caused by Plaintiff despite remaining under a corrective action plan and noted as "high risk" long after her removal; and

- Plaintiff's termination later echoed this statement as if she had continued to contribute in a sub-par manner.

*Id.* at 10-11. Notably, Plaintiff provides no citations to specific portions of the available record to support these arguments. Rather, she summarily argues that "[t]he above, when viewed in the light most favorably to the Plaintiff, constitutes actionable defamation by word and act. The limited perspective in which the Defendant requests the Court view the evidence is misguided." Pl.'s Mem. 11. Plaintiff then argues Wateree is not entitled to judgment as a matter of law as to the defense of privilege or truth. *Id.* at 11-12 & 11 n.3.

The undersigned agrees with Wateree that summary judgment is appropriate as to Plaintiff's defamation claim as a whole. The "summarized" evidence Plaintiff presents is conclusory and vague. Fatal to her claim, Plaintiff does not proffer any evidence or record citations to support her allegations. *See* Fed. R. Civ. P. 56(c)(3) (emphasizing that "[t]he court need consider only the cited materials" in deciding a motion for summary judgment); Local Civ. Rule 7.05(A)(4) (D.S.C.). Although the court is to view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict" in his or her favor. *Anderson,* 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Dash v. Mayweather,* 731 F.3d 303, 311 (4th Cir. 2013); *Stone v. Liberty Mut. Ins. Co.,* 105 F.3d 188, 191 (4th Cir. 1997). Stated another way, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (*quoting Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n. 7 (5th Cir. 1992)).

Plaintiff has not directed the court to any evidence to support an argument that the newly identified instances of alleged defamation were published or otherwise met the elements required to establish defamation. *See Williams v. Lancaster Sch. Dist.*, 631 S.E.2d 286, 292 (S.C. Ct. App.

21

2006) (holding that at summary judgment, a plaintiff's inability to identify competent evidence in the record showing an alleged defamatory statement and that the alleged statement was published to a third party is fatal). While it is true that defamation can be indirect, that does not excuse Plaintiff from her responsibility of providing specific evidence to support her claim. Plaintiff's synopsis of her defamation claim reads more like a jury argument than a response to summary judgment. For example, she indicates Coleman sought to reduce her salary without changing her job duties, "which interaction became known throughout the agency." Pl.'s Mem. 10. Being "known throughout the agency" is not sufficient evidence of publication at this stage of the litigation. *Cf. Johnson v. Duke Energy Corp.*, CA No. 0:13-2967-MBS, 2014 WL 2434630, at *2 (D.S.C. May 29, 2014) (denying defendant's *motion to dismiss* slander claim when plaintiff pleaded defamatory statements made to co-workers, "a discrete group of individuals" and noting discovery would afford plaintiff time to try and identify them to establish the publication element). The remaining "evidence" Plaintiff references is even less specific and provides no indication defamatory statements or actions were published or were untrue.[7]

Because Plaintiff has not proffered evidence sufficient to survive summary judgment as to the elements of defamation as to which she indisputably has the burden of proof, summary judgment is appropriate. The court need not consider Plaintiff's arguments that Wateree has not satisfied its burden of proof as to the affirmative defenses of privilege or truth.

The undersigned recommends summary judgment be entered as to Plaintiff's defamation claim.

---

[7] That Plaintiff was placed on administrative leave, for example, is unquestionably true. Plaintiff's statement that she was moved to various positions in 2011 and 2012 "despite producing no evidence of poor performance to justify such demotions," Pl.'s Mem. 10-11, is an inaccurate statement of the record facts.

VI.    Plaintiff's Civil Conspiracy Claim

Plaintiff's other remaining claim is one for common-law civil conspiracy, which she brings against all of the Individual Defendants in their individual capacities. 2d Am. Compl. ¶¶ 61-68. Plaintiff avers, *inter alia*, that the Individual Defendants acted "outside the scope of their employment and in abuse of their positions to harass the Plaintiff on a systematic basis which ultimately resulted in her termination." *Id.* ¶ 63. Defendants submit several arguments in support of their Motion for Summary Judgment as to this cause of action.

"A civil conspiracy is a combination of two or more persons joining for the purpose of injuring and causing special damage to the plaintiff." *McMillan v. Oconee Mem'l Hosp., Inc.*, 626 S.E.2d 884, 886 (S.C. 2006). To prevail on her civil conspiracy claim, Plaintiff must show: (1) a combination of two or more persons; (2) for the purpose of injuring the plaintiff; (3) causing plaintiff special damage. *Cowburn v. Leventis*, 619 S.E.2d 437, 453 (S.C. Ct. App. 2005). To be actionable, a civil conspiracy claim "must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint." *Hackworth v. Greywood at Hammett, LLC*, 682 S.E.2d 871, 874 (S.C. Ct. App. 2009).

Defendants first argue they are entitled to judgment as a matter of law based on South Carolina case law that holds an "at-will employee may not maintain a civil conspiracy action against her employer" for actions resulting in termination. *See Angus v. Burroughs & Chapin Co.*, 628 S.E.2d 261, 262 (S.C. 2006) ("*Augus II*");  *see also Faile v. Lancaster Cnty.,* No. 11-2206, 2013 WL 786447 at *5 (D.S.C. Mar. 1, 2013) ("[A] civil conspiracy claim by an at-will employee against an employer *arising out of the employee's termination* is barred . . . ." (citations omitted)). Plaintiff admits she was an at-will employee. Pl.'s Dep. 31. In her deposition, Plaintiff submits the Individual Defendants "conspired against [her] to have [her]

removed from [her] employment." *Id.* at 166. Accordingly, Defendants argue Plaintiff's civil-conspiracy claim should be dismissed based on *Angus* and its progeny. Defs.' Mem. 31-32, Defs.' Reply 3-4.

Defendants also argue Plaintiff's civil-conspiracy claim fails on its merits for several additional reasons: 1) because Plaintiff has not provided evidence of the Individual Defendants in furtherance of the conspiracy; 2) because Wateree cannot, through its employees and directors, conspire against itself; and 3) because Plaintiff has not alleged special damages. Defs.' Mem. 32-35.

Although Plaintiff offers argument in response to Defendants above-listed arguments against the civil-conspiracy claim, she proffers no argument as to Defendants' claim that *Angus* requires judgment as a matter of law as to this claim. *See* Pl.'s Resp. 12-17. Accordingly, summary judgment in favor of Defendants for this reason alone would be appropriate. *See, e.g., Langley v. Dolgencorp, LLC*, 972 F. Supp. 2d 804, 827 n.8 (D.S.C. 2013) (noting plaintiff's failure to address arguments raised in defendant's summary judgment motion considered abandonment of the relevant cause of action); *see also Eady v. Veolia Transp. Servs., Inc.*, 609 F. Supp. 2d 540, 560-61 (D.S.C. 2009).

Further, the undersigned agrees with Defendants that *Angus* prevents Plaintiff from pursuing a civil-conspiracy claim against the Individual Defendants. In *Faile*, the court dismissed a former employee's civil conspiracy claim against her employer (Lancaster County) and two county officials responsible for his termination. The court explained that in *Angus I,*[8] "the South Carolina Court of Appeals held that an at-will employee cannot sue his employer, or anyone

---

[8] *Angus v. Burroughs & Chapin Co.*, 596 S.E.2d 67 (S.C. Ct. App. 2004) (dismissing former county employee's civil-conspiracy claim brought against county council members in individual capacity regarding termination of employment) ("*Angus I*") (affirmed in pertinent part by *Angus II*).

acting within his authority on behalf of his employer, for civil conspiracy arising out of his termination." *Faile,* 2013 WL786447, at *4. *Angus II* "did not disturb *Angus I*'s holding that an at-will employee could not maintain an action against the employer, or those authorized to act on behalf of the employer, for civil conspiracy that resulted in the employee's termination." 2013 WL 786447, at *4 n.6. Consequently, consistent with *Angus,* the court in *Faile* dismissed the civil conspiracy claim not only against the governmental entity that employed the plaintiff but also against the two county officials who made the decision to terminate the plaintiff. *Id.* at *5. *Cf. Reed v. Aiken Cnty.*, C.A. No. 1:09-1755-MBS, 2010 WL 2985805 (D.S.C. July 26, 2010) (denying Rule 12(b)(6) motion in case brought by former county employee who was not terminated but who was "forced to resign" based on actions of county administrator and county council chairman).

Here, Plaintiff, an at-will employee, was terminated. Plaintiff's civil-conspiracy cause of action against the Individual Defendants should be dismissed.

In addition, Plaintiff's civil conspiracy claim fails on its merits because she has failed to present any acts by the individual defendants in furtherance of the alleged conspiracy. "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint." *Hackworth v. Greywood at Hammett, LLC*, 682 S.E.2d 871, 874 (S.C. Ct. App. 2009). The acts presented in furtherance of the alleged conspiracy must be "separate and independent from other wrongful acts alleged in the complaint, and the failure to properly plead such acts will merit the dismissal of the claim. *Id.* at 875. Plaintiff claims that the Individual Defendants conspired to remove her from her employment with Wateree. Pl.'s Dep. 166.

In responding to Defendants' Motion, Plaintiff briefly sets out evidence regarding Coleman's 2010 hiring of Defendant Davis and his quick promotion to the position of COO. Pl.'s Mem. 14-15 (citing Davis Dep. 15, 17, 24-29). Plaintiff submits that Coleman's hiring of Defendants Davis and Meagley are concerning because they "raise[] great concerns of nepotism." Pl.'s Mem. 14-15. She provides no competent evidence to support her apparent argument that such hires were acts in furtherance of the conspiracy to terminate Plaintiff. *E.g.*, Pl.'s Mem. 15 ("Meagley established a pattern of disregarding the Plaintiff and her concerns while carrying out the orders of Coleman; one must assume because of their close relationship."). Such assumptions are not grounded in competent evidence and do not suffice to defeat summary judgment. Plaintiff has not provided evidence of independent acts carried out by any of the Individual Defendants in furtherance of the alleged conspiracy.

Moreover, Plaintiff's civil conspiracy claim fails because Wateree cannot conspire with itself. "A civil conspiracy cannot be found to exist when the acts alleged are those of employees or directors, in their official capacity, conspiring with the corporation." *McMillan*, 626 S.E.2d at 886. Plaintiff has not presented any evidence that the Individual Defendants acted outside of the course and scope of their employment.[9] Pursuant to the intercorporate conspiracy doctrine, an entity cannot conspire with itself. *McLain v. Pactiv Corp.*, 602 S.E.2d 87, 90 (S.C. Ct. App. 2004) (holding a corporation cannot conspire with itself and the acts of agents of the corporation are the acts of the corporation). Because Plaintiff has not presented any evidence that the Individual Defendants conspired with each other or that they acted outside the scope of their

---

[9] In responding to Defendants' Motion, Plaintiff simply states the doctrine of intercorporate immunity, even if it could be invoked on these facts, would "not be dispositive because a reasonable jury could infer, on the evidence presented, that the Individual Defendants were acting outside the course and scope of their employment." Pl.'s Mem. 16. This generalized argument is far from specific enough to defeat summary judgment.

employment, the civil conspiracy claim must be dismissed. *McMillan*, 626 S.E.2d at 887 ("no conspiracy can exist if the conduct challenged is a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment.").

The Individual Defendants are entitled to summary judgment as to Plaintiff's Civil-Conspiracy claim.[10]

VII.    Conclusion and Recommendation

For the reasons set forth above, it is recommended that Defendants' Motion for Summary Judgment be granted and this matter be ended.

The Clerk of Court is to send this to Plaintiff by both regular and certified mail.

IT IS SO RECOMMENDED.

June 17, 2015                                         Kaymani D. West
Florence, South Carolina                             United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

---

[10] Based on the recommended disposition, the undersigned does not consider Defendants' additional arguments.